# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| DONCHII MALONE, ) | |
| ) | |
| Petitioner, ) | |
| ) | 04 C 8008 |
| v. ) | |
| ) | Judge George W. Lindberg |
| J.R. WALLS,[1] Warden, ) | |
| Western Illinois Correctional Center, ) | |
| ) | |
| Respondent. ) | |

## MEMORANDUM OPINION AND ORDER

The Seventh Circuit Court of Appeals reversed this Court's denial of petitioner's habeas petition, and remanded the case for further proceedings on petitioner's ineffective assistance of counsel claims. Malone v. Walls, 538 F.3d 744 (7th Cir. 2008). Pursuant to the remand order, this Court conducted an evidentiary hearing. Having carefully considered the evidence presented at that hearing, the Court again denies the habeas petition.

### I. Factual and Procedural Background

The Court begins with a summary of the proceedings at petitioner's criminal trial in state court. Petitioner was charged with murdering LaRoyce Kendle and Larry Lane, and was jointly tried with co-defendants Michelle Davis and Phillip Taylor. Petitioner was tried by a jury, while Davis and Taylor opted for a bench trial.

At trial, two primary witnesses testified for the prosecution: Antonio Stewart and Oneida Tate. There was no physical evidence linking petitioner to the crime.

---

[1] Scott McKee is substituted as the respondent in this habeas action, since he is currently the warden of the Western Illinois Correctional Center where petitioner is housed. See Rule 2(a) of the Rules Governing Habeas Corpus Cases under 28 U.S.C. § 2254; Fed. R. Civ. P. 25(d)(1).

Antonio Stewart was fourteen years old at the time of the murders, and sixteen at the time of the trial. Stewart testified that on the evening before the murders, he and victims Kendle and Lane had encountered defendants Michelle Davis and Phillip Taylor, who were rival gang members to Stewart, Kendle, and Lane. At that time, Lane took a hat off Taylor's head and set it on fire. Lane then gave the hat to Stewart, who threw it into the crowd, hitting Davis in the face. Davis told Stewart that she was going to get him.

Stewart testified that early the next morning, on July 22, 1986, he, Kendle, and Lane were sitting in a parked car when petitioner, Taylor, and Davis approached the car. After some words were exchanged, petitioner shot Lane twice, then shot Kendle twice. Taylor pulled out a gun and pointed it at Stewart, and Stewart ran away. After petitioner, Taylor and Davis ran away, Stewart returned to the scene and picked up Kendle, who said, "that bitch," and then died.

On cross examination by petitioner's attorney, Stewart admitted that petitioner had not been present during the altercation between the victims, Taylor, and Davis the previous evening. Stewart also admitted that immediately after the shots were fired, he yelled, "the bitch popped 'em, the bitch popped 'em," referring to Michelle Davis. Stewart admitted that when police officers interviewed him at the scene, he identified Taylor and Davis as having been involved, but did not identify petitioner to the police until approximately ten hours later, even though he knew petitioner. Finally, Stewart admitted that Davis was "somewhat" his girlfriend.

Oneida Tate testified that she lived in a second-floor apartment overlooking the crime scene. On the day of the murders, Tate saw Kendle, Lane, and Stewart talking with petitioner, Michelle Davis, and another man. Tate left her window, but returned when she heard gunshots. Tate saw Stewart, petitioner, Davis, and the other man running from the scene. Tate testified that

Davis had a gun in her hand. Tate heard Stewart screaming, "The bitch popped 'em. The bitch popped 'em." Tate identified petitioner and Davis in lineups, but could not identify Taylor.

Petitioner rested without presenting evidence. Taylor then presented several witnesses in his defense who were not heard by the jury trying petitioner. These witnesses included Teddy Williams and Anthony Villanueva. Williams, a police officer, testified that when he interviewed Antonio Stewart at the scene of the murders after the shooting, Stewart had described the shooter as having a light complexion.

Outside the presence of petitioner's jury, Villanueva testified that he observed the shooting from his basement apartment. Villanueva saw six people at the scene, four of whom he knew: victims Kendle and Lane, Stewart, and defendant Michelle Davis. He testified that the other two individuals at the scene were men, and that he did not know them. He testified that he knew defendant Taylor, and that Taylor was not one of the other two men at the scene. Villanueva testified that he did not know a person named Donchii Malone, and that he would not know if one of the other two men at the scene was a person named Donchii Malone. When asked whether he saw any of the six individuals in the courtroom, Villanueva identified only Michelle Davis. Villanueva testified that the two men whom he did not know shot Lane and Kendle. Villanueva also testified that he heard Michelle Davis say "they got popped" immediately after the shooting.

The jury convicted petitioner of two counts of first-degree murder. The trial court acquitted Davis and Taylor.

After unsuccessfully pursuing appellate and post-conviction relief in state court, petitioner filed a federal habeas petition. Among other claims, petitioner raised ineffective

3

assistance of counsel claims in his habeas petition. This Court dismissed petitioner's habeas petition.

The Court of Appeals reversed, and remanded petitioner's habeas petition for further proceedings. Malone v. Walls, 538 F.3d 744 (7th Cir. 2008). Specifically, the Court of Appeals instructed this Court to develop the record on the issue of whether petitioner had showed that his trial counsel's performance fell below an objective standard of reasonableness. Id. at 762. The Court of Appeals directed this Court to consider whether "counsel's cumulative errors rise to the level of ineffective assistance of counsel and whether, as a result of those errors, there is a reasonable probability that the outcome of the trial would have been different." Id.

## II. Evidentiary Hearing

On June 24, August 5, and August 12, 2009, this Court conducted an evidentiary hearing pursuant to the Court of Appeals' remand order. Two witnesses testified at the hearing: petitioner's trial counsel, Michael Morrissey; and petitioner's expert witness, Jeffrey Urdangen. At the hearing, petitioner challenged Morrissey's decision not to call Anthony Villanueva as a witness at trial, and Morrissey's decision not to impeach Antonio Stewart with his initial description of the shooter as light-skinned.

### A. Michael Morrissey

Michael Morrissey represented petitioner in petitioner's state court trial. Morrissey joined the Public Defender's Office in 1977, and was a senior attorney in the Public Defender's Office's murder task force when he began representing petitioner in 1986. At the time of petitioner's trial in 1988, Morrissey had handled approximately 65 murder trials, and eight to ten death penalty sentencing hearings.

Morrissey interviewed Anthony Villanueva prior to trial. At that time, Villanueva was sixteen years old. Villanueva told Morrissey that on the day of the murders, he looked out his window and saw Antonio Stewart, Michelle Davis, and victims Larry Lane and LaRoyce Kendle. There was some conversation between Davis, Kendle, and Stewart, and then two other men approached them. The two men backed up onto the parkway and a little beyond, and then Villanueva heard shots that sounded as having come from two different guns. Although he did not see the people who fired the shots, he believed that the shots came from the two men.

Morrissey testified that when he interviewed Villanueva, Villanueva was unable to give any physical descriptions of the men he said he saw at the scene, or their clothing. The only subject about which Villanueva expressed any certainty was that his "associate," defendant Taylor, was not one of the men at the scene.

During his pretrial interview of Villanueva, Morrissey also showed Villanueva a photograph of a lineup that included petitioner. When Morrissey pointed to petitioner on the photograph, Villanueva said that he did not know the man. Villanueva said that he had heard the name "Donchii" before, but that he did not know who "Donchii" was. Villanueva told Morrissey that he did not know whether petitioner was one of the two men he saw at the scene of the shooting, but that it could have been him. Villanueva also said that he could not rule petitioner out, or say that petitioner definitely was not one of the two men he saw.

Villanueva also told Morrissey that Michelle Davis had not had a gun in her hand at the time of the murders, and that she did not fire any shots. Villanueva said that he did not hear Stewart say, "The bitch popped 'em." Rather, Villanueva maintained that Davis had said "they got popped" after the shooting.

Morrissey developed a defense theory that Michelle Davis had been the sole shooter, although Morrissey did not concede that petitioner was present at the crime scene. To advance his theory, Morrissey planned to attack Stewart's credibility during cross-examination, and to bring out favorable facts from Oneida Tate. As part of his strategy, Morrissey also intended to oppose an accountability jury instruction, and to try to convince the judge to give a "mere presence" jury instruction.

Although the usual practice in the Public Defender's Office was for more than one attorney to participate in a capital case, Morrissey tried petitioner's case by himself. Morrissey testified that he decided to try petitioner's case by himself because, although the case was a very serious one, it was also very short, and only involved two key witnesses. Morrissey stated that he discussed his trial strategy with his colleagues, both before and during the trial. Prior to petitioner's trial, Morrissey had tried two capital cases by himself.

At trial, Morrissey cross-examined Stewart in a number of areas. Morrissey questioned Stewart about an aggravated battery conviction that had not been brought out by the prosecutor or petitioner's co-defendants' attorneys. Morrissey brought out that despite the fact that Stewart knew petitioner, he did not identify petitioner by name to the police at the scene of the murders. Morrissey also brought out that Stewart had said, "the bitch popped 'em" immediately after the shootings. In an effort to establish that petitioner lacked a motive that his co-defendants may have had, Morrissey elicited testimony from Stewart that petitioner had not been present during the altercation the night before the murders. Morrissey felt that Stewart became a much less credible witness as a result of the cross-examination, particularly concerning his prior convictions, his failure to initially identify petitioner by name to police, and his statement to

police that Taylor and Davis were involved in the shooting.

Morrissey also cross-examined Oneida Tate. During that cross-examination, Morrissey brought out that immediately after the shooting, Tate had observed a gun in Michelle Davis's hand, and had heard Antonio Stewart yell "the bitch popped 'em, the bitch popped 'em." Morrissey felt that Tate had been a credible witness.

Morrissey spoke with Anthony Villanueva again after the trial began, before Morrissey rested petitioner's case and before Villanueva testified on Taylor's behalf. During this conversation, Morrissey asked Villanueva substantially the same questions he had asked during his pretrial interview, and Villanueva responded to Morrissey's questions in substantially the same way as he had responded then. Morrissey again showed Villanueva the lineup photograph, and Villanueva told Morrissey that petitioner "might have been there." Morrissey recommended to petitioner that they not call Villanueva to testify on petitioner's behalf. Morrissey listened to Villanueva testify on Taylor's behalf, but decided not to reopen petitioner's case to call Villanueva.

At the jury instructions conference, Morrissey objected to the prosecution's proposed accountability instruction; the trial court overruled this objection. Morrissey proposed two versions of a "mere presence" instruction. The first version read: "Mere presence at the scene, plus knowledge that a crime is being committed, without more, does not establish accountability." Morrissey's alternate version read: "Mere presence at the scene of the crime is not sufficient to prove guilt beyond a reasonable doubt." The trial court rejected both versions.

**B. Jeffrey Urdangen**

Petitioner's expert witness, law professor Jeffrey Urdangen, testified at the evidentiary

hearing as to his opinion that Morrissey's representation of petitioner was objectively deficient. This Court had initially determined that Urdangen would not testify at the hearing, on the basis that Urdangen's testimony would not assist the Court in understanding the evidence or in determining a fact in issue. See Fed. R. Evid. 702. However, in the interest of providing the Court of Appeals with the most complete record in the event of an appeal, this Court reconsidered its prior ruling and heard Urdangen's testimony.

Having considered all of the evidence presented at the evidentiary hearing, the Court still finds that this expert testimony is not helpful. Mr. Urdangen's opinion regarding the reasonableness of Morrissey's criminal defense strategy does not add anything to the Court's own base of knowledge and experience. As discussed further below, based on its knowledge and experience, the Court arrives at a different conclusion than Mr. Urdangen regarding the reasonableness of Morrissey's decision not to reopen petitioner's case to call Anthony Villanueva, and disagrees with Mr. Urdangen's suggestion that Morrissey should have made a late change in trial strategy.

### III. Legal Standard

Under Strickland v. Washington, 466 U.S. 668, 687-88, 692 (1984), petitioner must show that his trial counsel's performance "fell below an objective standard of reasonableness," and that prejudice resulted. The Court reviews petitioner's counsel's performance as a whole. See Smith v. Gaetz, 565 F.3d 346, 353 (7th Cir. 2009). The Court's review of trial counsel's performance "'must be highly deferential' and 'every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" Id. at 352-53 (quoting Strickland, 466 U.S.

8

at 689)).

## IV. Analysis

The Court begins with petitioner's assertion that Morrissey acted unreasonably when he did not reopen petitioner's case to call Anthony Villanueva as a witness, after Villanueva failed to identify petitioner in court when he testified on Taylor's behalf. At the evidentiary hearing, Morrissey testified that while he had not conceded at trial that petitioner had been at the scene of the murders, his defense theory was that Michelle Davis was the sole shooter. Based on his interviews with Villanueva, Morrissey believed that if he had called Villanueva to testify in petitioner's case, at best Villanueva would have testified that he did not know whether petitioner was at the murder scene, and at worst Villanueva would have elaborated that petitioner could have been there. In addition, Morrissey was concerned that if he called Villanueva to testify, the prosecution would have a second opportunity to cross-examine Villanueva, and could bring out facts that were inconsistent with his defense theory that Davis was the shooter, such as that it was the men who fired the shots, that Davis did not have a gun, and that Stewart did not say, "the bitch popped 'em." For these reasons, Morrissey explained, Villanueva's failure to identify petitioner during Taylor's case did not change Morrissey's opinion that he should not call Villanueva to testify on petitioner's behalf.

Petitioner argues that Morrissey's decision not to call Villanueva as a witness after hearing his testimony for Taylor was objectively unreasonable because the risk that Villanueva would have testified differently the second time was relatively low. Petitioner's expert, Mr. Urdangen, noted that the prosecutors were unaware of what Villanueva had previously told Morrissey, and speculated that they were unlikely to probe Villanueva on the identification issue

9

since they had just heard him fail to identify petitioner in court during Taylor's case. Petitioner also argues that it was unreasonable for Morrissey to believe that if he called Villanueva, the prosecutors would likely bring out facts during cross-examination that were harmful to petitioner's case.

The Court finds that Morrissey's decision was reasonable. Based on Morrissey's prior interviews with Villanueva, Morrissey had reason to fear that Villanueva would testify that petitioner might have been at the scene. Although Villanueva failed to identify petitioner during the prosecutor's cross-examination in Taylor's case, Villanueva did not affirmatively and unequivocally testify during Taylor's case that petitioner was not at the scene.[2] Moreover, Villanueva's unclear and contradictory testimony in Taylor's case did not show Villanueva to be a strong witness; for example, from Villanueva's testimony it is difficult to tell even whether Villanueva saw the shooting. Given Villanueva's previous statements to Morrissey that petitioner could have been at the scene, it was reasonable for Morrissey to be concerned about what this teenager might say – even on direct examination -- if he was recalled to the stand.

Petitioner also argues that Morrissey's concerns were unreasonable because, as Mr. Urdangen testified, even if Villanueva did testify that petitioner could have been present at the murder scene, petitioner could have offered Villanueva's earlier inconsistent testimony (that is, Villanueva's prior failure to identify petitioner in the courtroom) as substantive evidence.

---

[2] The Court notes that contrary to petitioner's representations in his opening brief, there was no "repeated non-identification of [Morrissey's] client from the witness stand" by Villanueva, and Villanueva did not fail to identify petitioner on direct examination. Rather, the only non-identification of petitioner occurred during cross-examination, when Villanueva identified only Davis when asked if he saw anyone in the courtroom whom he had seen at the murder scene.

Respondent concedes that state evidentiary law at the time of petitioner's trial would have permitted the use of Villanueva's prior testimony as substantive evidence, but argues that this would not cure the harm already caused. The Court agrees that, as a practical matter, Villanueva's testimony that petitioner could have been present could well have harmed petitioner's case, even if it was followed by evidence that Villanueva had previously testified in a contradictory manner. Such a scenario would have forced the jury to choose which version of Villanueva's testimony to believe, and would have shown Villanueva to be an unreliable witness.

Nor was it unreasonable for Morrissey to be concerned about what Villanueva might say on cross-examination. If Morrissey had called Villanueva, it was reasonable to expect that the prosecution would have, at minimum, attacked Villanueva's credibility by exploring Villanueva's ability to observe the scene, which would have included what else he saw and heard. As Morrissey testified, Villanueva's testimony that it was the men who fired the shots, that Michelle Davis did not have a gun, and that Stewart did not say "the bitch popped 'em" would have undermined Morrissey's defense theory that Davis was the shooter.

At the evidentiary hearing, Mr. Urdangen contended that after hearing Villanueva's testimony in Taylor's case, Morrissey should have abandoned his original theory in favor of a theory that petitioner was not present at the murder scene. Petitioner argues that Morrissey "was ineffective because he predicated Mr. Malone's entire defense on a mistaken understanding of well-settled Illinois law." Specifically, petitioner contends that Morrissey's theory of the defense was entirely dependent upon obtaining a non-pattern "mere presence" jury instruction, when Morrissey should have known that Illinois courts consistently reject requests for such an instruction. According to petitioner, Morrissey's reliance on this theory "left Mr. Malone

11

without a viable defense, absent introducing the rebuttal eyewitness testimony in his defense case."

As an initial matter, the Court notes that petitioner's characterization of Morrissey's defense theory is not accurate. As discussed above, Morrissey's theory was that Michelle Davis was the shooter. To be sure, one strategy Morrissey used in an effort to advance that theory was to request that the trial court give a "mere presence" jury instruction. However, Morrissey's defense theory was not dependent on that request being granted. To the contrary, even though the trial court denied Morrissey's request for a "mere presence" instruction, Morrissey could, and did, argue to the jury that Michelle Davis was the shooter.

Nor is the Court persuaded that it was objectively unreasonable for Morrissey to persist with his original defense theory after Villanueva testified in Taylor's case. If Morrissey had changed his theory of the case at the close of evidence to a theory that petitioner was not present at the scene of the murder, he would have had to convince the jury not only that Stewart's testimony was incredible, but also that Oneida Tate's testimony was incredible. Tate was as disinterested a witness as Villanueva (and perhaps more so, given Villanueva's status as an "associate" of petitioner's co-defendant, Taylor). Morrissey believed that Tate's trial testimony had been credible, an assessment that seems reasonable: Tate had an adequate opportunity to view petitioner, and she recognized petitioner as someone she had previously seen in the neighborhood.

In addition, although Tate's testimony placing petitioner at the scene may have been harmful to petitioner's defense, she did not testify that petitioner had a gun or that he had shot anyone. Indeed, much of Tate's testimony was helpful to the defense. For example, Tate

12

implicated Davis as the shooter when Tate testified that immediately after the shooting she observed a gun in Michelle Davis's hand and heard Antonio Stewart yell "the bitch popped 'em." Thus, it was reasonable for Morrissey to continue with the theory he had pursued throughout trial – a theory that was consistent with Tate's credible testimony – rather than make a last-minute attempt to discredit Tate in favor of the testimony of a witness who had shown himself to be less reliable. Having carefully considered Morrissey's testimony, which the Court finds credible, the Court concludes that Morrissey's decision not to call Villanueva as a witness in petitioner's case was a reasonable strategic decision.

The Court next turns to petitioner's contention that Morrissey made an objectively unreasonable decision when he chose not to cross-examine Stewart about Stewart's initial statement to the police that the shooter had a light complexion.[3] At the evidentiary hearing in this proceeding, Morrissey explained that he did not want to call a police officer to perfect his impeachment on this aspect of Stewart's initial description because of his concern that if he did so, other aspects of the description that would have been harmful to petitioner's defense would have come out as well.[4] Specifically, Stewart had also described the shooter as a five-foot-seven-inch, 150-pound black man, between the ages of 20 and 23, with black hair and brown eyes, and wearing a t-shirt, blue jeans, and a Cubs hat. This description was consistent with petitioner's appearance, and was consistent with both Stewart's and Oneida Tate's trial testimony that

---

[3] The parties agree that petitioner does not have a light complexion, an assessment with which the Court concurs based on its opportunity to observe petitioner at the evidentiary hearing.

[4] When petitioner's co-defendant's attorney cross-examined Stewart about his initial statement to police, Stewart denied telling police that the shooter had a light complexion. Therefore, in all likelihood, petitioner's counsel would have had to call the police officer to perfect the impeachment, had he cross-examined Stewart on this point.

13

petitioner was wearing a Cubs hat.

Even if the police officer had been permitted to testify as to the remainder of Stewart's initial description (a point on which the parties disagree), the Court is not persuaded that calling the police officer would have been as harmful as Morrissey maintains. Other than the inclusion of the Cubs hat, Stewart's description was relatively generic and could have matched any number of individuals. In addition, Stewart had already testified at trial that petitioner was wearing a Cubs hat. While this testimony may have been reinforced if the police officer testified that Stewart had also mentioned the Cubs hat in his initial description of the shooter, the Court agrees with Mr. Urdangen that this disadvantage would not seem to outweigh the potential benefit of further attacking Stewart's credibility with his early description of the shooter's skin color.[5] Nevertheless, although the balance on this issue weighs in favor of presenting the evidence, the Court does not find that this error was so significant as to amount to ineffective assistance of counsel, given that petitioner has not shown that Morrissey committed other errors. See Malone, 538 F.3d at 762 (concluding that "[c]ounsel's failure to impeach Stewart on this one variation, *standing alone*, does not rise to the level of ineffective assistance, nor is there a reasonable probability that it affected the outcome of the trial").

## V. Conclusion

For the reasons stated above, the Court concludes that petitioner has not shown that the legal representation he received at trial fell below an objective standard of reasonableness and that prejudice resulted.

---

[5] The Court notes, however, that even Mr. Urdangen acknowledged that seasoned trial attorneys could differ on the relative benefit and harm of impeaching Stewart on this point.

14

**ORDERED**: Scott McKee is substituted as the respondent in this habeas action, since he is currently the warden of the Western Illinois Correctional Center where petitioner is housed. See Rule 2(a) of the Rules Governing Habeas Corpus Cases under 28 U.S.C. § 2254; Fed. R. Civ. P. 25(d)(1). Petitioner's ineffective assistance of counsel claims in his amended petition for writ of habeas corpus are denied.

ENTER:

George W. Lindberg
Senior U.S. District Judge

DATED:    October 21, 2009